UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Mag. No. 04-1651 |
| VICTOR SOSA, a/k/a ) | |
|     Victorino, ) | |
| ALEX PEREZ, a/k/a ) | |
|     Ariel Lugo-Torres, ) | |
| DIEGO ORTIZ, ) | |
| ) | |
|     Defendants. ) | |

### AFFIDAVIT OF DEA TASK FORCE AGENT CHRISTOPHER BORUM

I, Christopher Borum, being duly sworn, depose and state as follows:

1. I am a Detective with the Chelsea Police Department and am a deputized Deputy U.S. Marshal currently assigned to the Drug Enforcement Administration's Task Force 2 in Boston, Massachusetts. I have been employed by the Chelsea Police Department since August 1994, and have been a detective since August of 1999. During that time, I have attended numerous drug-trafficking related training programs, and have had experience in investigating drug traffickers. I am familiar with the use of various forms of electronic surveillance as an investigative tool. In 1999, I was assigned to the Chelsea Drug Task Force. I have participated in investigations involving cocaine, cocaine base, marijuana, heroin and various other controlled substances. These investigations have resulted in hundreds of arrests and convictions and over one hundred search warrants. I have participated in joint federal,

state and local investigations with DEA since 2000. I have been assigned to the DEA Task Force since approximately the fall of 2002.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information provided to me by other federal and local law enforcement officers and a reliable confidential informant ("CI"). The CI is a paid informant who has worked with DEA since approximately 1989. The CI has provided reliable information to DEA and other law enforcement agencies during that time that has lead to numerous arrests, convictions and seizures of drugs and drug proceeds. To my knowledge, the CI has been a reliable informant during that time period.

4. This affidavit is submitted in support of a criminal complaint charging VICTOR SOSA, a/k/a Victorino; ALEX PEREZ, a/k/a Ariel Lugo-Torres; and DIEGO ORTIZ with conspiracy to distribute, and possess with the intent to distribute, five kilograms of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

5. On February 13, 2004, the above-referenced defendants were

arrested by myself and other officers participating with DEA Task Force 2 in this investigation. The following paragraphs describe the events leading up to, and including, those arrests. Because this affidavit is submitted for the limited purpose of obtaining a complaint against the above-referenced defendants, I have not set forth all of the information I have regarding this investigation; rather, I have only set forth those facts that I submit are sufficient to establish probable cause that the defendants committed the charged offense.

6. Prior to February 11, 2004, the CI, working in conjunction with DEA, engaged in several consensually recorded telephone calls with VICTOR SOSA during which SOSA offered to sell the CI cocaine and heroin. The CI knew SOSA as Victorino. Victorino identified himself as VICTOR SOSA at the time of his booking. On February, 10, 2004, the CI met with SOSA in East Boston and had taped conversations regarding the future sale of cocaine and heroin to the CI. SOSA offered to sell the CI five kilograms of cocaine for $25,000 per kilogram. The CI told SOSA he wanted to view the cocaine first. SOSA made a telephone call in the CI's presence to a person SOSA said was his cousin. SOSA then instructed the CI to drive him to 165 Cottage Street, the Mill Creek Condominium Complex, in Chelsea. They proceeded to the security office where, according to the CI, SOSA's cousin, subsequently identified as ALEX PEREZ, was located. SOSA showed the CI a brown wrapped kilogram of cocaine. SOSA cut a sample of powder

from the kilogram and showed it to the CI. In Perez's presence, SOSA discussed arrangements for the sale of the five kilograms of cocaine to the CI for $125,000. This meeting was consensually recorded and agents surveilled SOSA and the CI drive to and leave the Mill Creek condos together.

7.  On February 13, 2004, the CI had several consensually recorded telephone calls with SOSA to finalize the five kilogram sale. During the afternoon of February 13, the CI, together with an undercover officer, Massachusetts State Trooper Jaime Collazo, who was acting as the CI's partner, met with SOSA. The CI and the UC drove SOSA a short distance to Bennington Street, where they showed him a flash roll of U.S. currency. SOSA was dropped off on Bennington Street and SOSA stated that he would be ready to go forward with the deal after six.

8.  After several more recorded conversations between the CI and SOSA, they agreed to meet at the Kentucky Fried Chicken parking lot in Everett, off Route 16 later that evening and further agreed that the CI and UC would follow SOSA to another location. SOSA was surveilled by Task Force agents arriving at the KFC parking lot at approximately 6:30 in a 2002 Mercury Sable being driven by a person subsequently identified as DIEGO ORTIZ. I also subsequently learned that the Mercury Sable was owned by and registered to ORTIZ.

9.  The Mercury Sable pulled out of the KFC lot when the CI and UC arrived in the undercover vehicle. The undercover vehicle

-5-

followed the Mercury Sable while the CI called SOSA on the telephone. SOSA instructed the CI to follow him to his girlfriend's apartment to consummate the deal. At DEA's instruction, the CI and the UC stopped following SOSA. SOSA called the CI and asked what happened. The UC got on the telephone and advised SOSA that he did not like the way SOSA was proposing to do the deal. The UC told SOSA they would call him back in a little while.

10. After several more calls between SOSA, the CI and the UC, ORTIZ called the CI and asked what was happening. ORTIZ agreed to bring the drugs so that the UC, who the CI referred to his brother-in-law, could inspect them. ORTIZ and the CI agreed that they would then go back to an apartment to count and exchange the money for the drugs. The CI told ORTIZ they were at the Stop and Shop parking lot on Broadway in Malden. ORTIZ instructed the CI and the UC to stay there and wait for them.

11. A short time later, ORTIZ and SOSA showed up at the Stop and Shop in the Mercury Sable and parked with their trunk next to the trunk of the UC vehicle, which was occupied only by the UC at this point. Agents had previously directed the CI to leave for safety reasons. The UC observed a second car arrive at the same time as the Mercury Sable and park parallel to the UC's car. The driver of the second car, subsequently identified as PEREZ, opened the door and placed one leg out of the car, and began staring at the UC. SOSA got out of the car and asked the UC where the CI was.

-6-

The UC stated that the CI was nearby with the money. The UC said show me the stuff and if it's good I'll call him and have him bring the money and then we can go to another location to do the deal. SOSA agreed to this and walked to the trunk of the Mercury Sable and tapped on it. ORTIZ activated the trunk from inside the car. The UC retrieved a blue duffel bag from the trunk. SOSA pulled a kilogram from the bag and showed it to the UC. The UC placed his hand in the bag and felt four other kilogram sized packages. SOSA then placed the bag back in the trunk and closed the trunk. At that point, the UC gave the arrest signal. During this time, the driver of the other car continued to stare at the UC and SOSA.

12. Agents exited a nearby van, some wearing raid jackets, identified themselves as police and attempted to arrest the defendants. At this point, the Mercury Sable, which was being driven by ORTIZ, backed out and fled the parking lot at a high rate of speed with the five kilograms in the trunk. After a short pursuit, ORTIZ jumped out of the moving vehicle and fled on foot. He was apprehended a short distance from the vehicle. At the time of his apprehension, ORTIZ blurted out, in substance, that he was a U.S. citizen, that he was just the driver and that the other guy was doing the "deal." He was arrested, read his Miranda rights, and advised not to make any more statements until after he was booked. He was subsequently re-Mirandized at his booking and waived his Miranda rights. Although at one point he claimed that he did not know what SOSA was doing, he acknowledged, in substance, among

other things, driving SOSA back and forth that day and seeing SOSA place a duffel bag in the trunk of his Sable in Malden. He stated that SOSA asked him to drive him to the Stop and Shop. ORTIZ further acknowledged that prior to SOSA placing the duffel bag in his trunk, he met with the vehicle subsequently identified as PEREZ's car and that PEREZ's car followed them to the Stop and Shop. When asked what SOSA did for a living, ORTIZ replied, in a sarcastic tone: "Officer, please." He further acknowledged that the approximately ½ gram of cocaine and approximately seven small bags of marijuana found in the glove compartment of the Sable were his.

13.   SOSA was arrested on the scene without incident. PEREZ attempted to flee by car as the agents exited the van to surround the Mercury Sable. Another officer blocked off his exit. After being Mirandized, PEREZ waived his Miranda rights. He acknowledged, in substance, among other things, that his name was ALEX PEREZ, although he had previously identified himself to me as Ariel Lugo from Puerto Rico when I conducted a ruse interview with him several days earlier. I had also previously observed his mailbox to contain the name Ariel Lugo-Torres. PEREZ further acknowledged, in substance, among other things, bringing the kilogram of cocaine to show the CI on February 11, 2004, retrieving the duffel bag containing the five kilograms from his apartment, which he had been holding for SOSA for several days, and bringing it to SOSA prior to both cars driving to the Stop and Shop on

February 13, 2004. The five packages of cocaine were retrieved from the Mercury Sable. One of the packages was field-tested and tested positive for cocaine. The other four kilogram sized packages were wrapped in a manner similar to the kilogram that field-tested positive for cocaine.

Based on the foregoing, I submit that there is probable cause to believe that VICTOR SOSA, a/k/a Victorino; ALEX PEREZ, a/k/a Ariel Lugo-Torres; and DIEGO ORTIZ conspired to distribute, and possess with the intent to distribute, five kilograms of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

_____
Christopher J. Borum
Drug Enforcement Administration
Task Force Agent

Sworn and subscribed to before me this 14th day of February, 2004.

_____
CHARLES B. SWARTWOOD, III
United States Magistrate Judge
District of Massachusetts

-9-